263 P.2d 553

ROBY v. POTLATCH FORESTS, Inc.

No. 8029.

Supreme Court of Idaho.

Nov. 18, 1953.

Dee & MacGregor, Grangeville, for appellant.

Raymond C. McNichols, Orofino, for respondent.

Robert E. Smylie, Atty. Gen., and John W. Gunn, Asst. Atty. Gen., for Employment Security Agency.

GIVENS, Justice.

December 1951 claimant Roby, with his associate sawyer, Howell, was hired by the Potlatch Forests, Inc.; through Adrian Nel-

son, its employment manager, and assigned to work at Camp 60, about 100 miles distant from Orofino. The referral slip did not specifically state the type of sawing, but claimant and Howell both testified it was understood it was to be strip sawing and Nelson testified if it were not strip sawing, it would generally be so specified, and that—

> "(Nelson) * * * it was probably strip sawing." * * * "I imagine. I don't know what I told him at the time."

Upon arrival at the camp, there was no strip sawing work open and they were assigned to right-of-way contract sawing at $3 per thousand feet. They worked a day and a half or twelve hours, Roby felling and Howell bucking. Roby earned $30.49, which included $21.34 in wages and $9.15 rental of his saw, and quit. The rate was supposed to be $2.10 per thousand for labor and 90¢ for the use of the saw.

While the actual sawing, as to felling and bucking, is the same in right-of-way sawing as in strip sawing, in the latter, designated, marked trees alone are sawed; there is not as much moving around, with fewer, shorter moves between trees and apparently with closer access to roads; while right-of-way sawing is rougher and all the timber above a certain size (the smaller trees and brush being removed by bulldozers) has to be felled and with down-timber and windfalls, sawed into lengths so they can be moved and the entire right-of-way cleared for a road. The saw boss estimates, in right-of-way sawing, about the number of thousand feet in the particular area and fixes the rate per thousand, apparently between $2 and $3, so the right-of-way sawyer, theoretically, will be able to make as much or more than the strip sawyer.

Claimant testified he protested to the boss, before he began sawing on the right-of-way with his associate Howell, that the conditions were such they could not make the customary wages, even the customary minimum wage, which was asserted to be about $30 per day with the power saw—for a sawyer $20 a day net and $10 rent for the saw, the sawyer furnishing his own equipment, and that the reasons for quitting were:

> " * * *—we were not making the prevailing wage and the other was we were sent out for strip sawing, that is what we were hired for, or we wouldn't have went out.
>
> "Q. * * *, so you quit the poorer job to get a better one? A. That is right. We couldn't make wages."

After becoming eligible for employment security benefits by securing other employment, claimant sought compensation benefits.

By stipulation the testimony before the Claims Examiner, who denied compensation, together with further oral testimony

before the Board, was used and considered by the Board which made findings of fact substantially as above, reversing the Claims Examiner.

The Board's final findings of fact were as follows:

"The claimant, a skilled and experienced power sawyer by occupation was on December 4, 1951, referred by Potlatch Forests, Inc.'s employment office at Orofino, Idaho for work as a power sawyer, strip sawing at Camp 60 of said employer. Upon arriving at Camp 60 the claimant was assigned to work as a right-of-way power sawyer. Right-of-way sawing is less remunerative than strip sawing for the reason that the right-of-way sawyer is required to constantly move further away from the road and has a longer trip back and forth to work. Claimant worked a day and a half at Camp 60 and then quit, giving as his reason, 'unable to make wages.' His contention was that his net wages were below the minimum and that other jobs were available which paid the prevailing rate. The minimum net daily wage, not counting saw rental, for power sawyers in the general vicinity was approximately $20.00 per day. On the job in question claimant was netting approximately $14.16 daily, excluding saw rental. There was considerable turn-over of sawyers, sawyers were being hired continually in the general vicinity of Orofino. Within two weeks after the claimant was separated from the employment in question he was again hired as a power sawyer and netted a sum in the excess of $20.00 per day."

The rulings of law were as follows:

"2

"The claimant was justified in concluding that he was employed for strip sawing rather than right-of-way sawing.

"3

"The wages in this instance were substantially less favorable to the individual than those prevailing for similar work in the locality of the work offered.

"4

"The claimant, because of insufficient wages, had sufficient and good cause to quit his employment and that he was not disqualified to receive unemployment compensation benefits by reason of his having quit the employment herein involved."

The pertinent portions of Section 72-1366, Idaho Code, specifying what constitutes personal eligibility for benefits, are:

"(f) His unemployment is not due to the fact that he left his employment voluntarily without good cause, * * *.

*    *    *    *    *    *

"(h) His unemployment is not due to his failure without good cause to apply for available suitable work * * * or to accept suitable work when offered to him * * *.

"(i) In determining for the purposes of this act, whether or not work is suitable for an individual, the degree of risk involved to his health, safety, morals, his physical fitness, experience, training, past earnings, length of unemployment and prospects for obtaining local employment in his customary occupation, the distance of the work from his residence, and other pertinent factors shall be considered. No employment shall, in any event, be deemed suitable and benefits shall not be denied to any otherwise eligible individual for refusing to accept new work or to hold himself available for work under any of the following conditions:

"(1) * * *

"(2) If the wages, hours, or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality of the work offered; * * *."

■ The burden is on the employee to show good cause for quitting, that is, to justify him asking for employment security benefits. Department of Industrial Relations v. Mann, 35 Ala.App. 505, 50 So.2d 780.

The variable in the amount a right-of-way sawyer may make depends upon the estimate of the boss as to the conditions in the particular area, which includes size and number of trees, down and standing, and the topography and access to and condition of the area. Claimant contends the estimate made by the boss in this instance was too low for the area involved.

There was evidence as to the snow conditions and that it was necessary to work through the snow to get at down-timber, at least, which had to be sawed. At one of the hearings, Roby thus questioned Howell:

"Q. While we were out there we were working for less than wages for the period we was there. Was that not true? We was working too cheap for what we was investing? A. Well, the wages that I've always received before, that's true. I've never worked for under $30.00 a day. A person can look at a strip and after a day or two trying it you can figure out you aren't or you are going to make it, one way or the other. That there was—

"Q. We pretty well knew before we started that strip that we wasn't going to make it before we even started it, didn't we? A. Yes.

"Q. We thought we'd give it a try. That's what we told the saw boss, we'd give it a try. A. That's right."

There was no specific evidence as to the conditions of the right-of-way beyond

where claimant sawed the day and a half before he quit.

▮ Accepting the findings of fact by the Board, which disclose no real conflict in the evidence herein, review by the Court is of the conclusions of the Board, i. e., their application of the law to the facts. Horst v. Southern Idaho Oil Co., 49 Idaho 58(1), 286 P. 369; Smith v. McHan Hardware Co., 56 Idaho 43, 48 P.2d 1102; Rabideau v. Cramer, 59 Idaho 154, 81 P.2d 403.

"It is impossible to give a general definition of 'good cause.' The meaning of those words must be determined in each case from the facts of that case. * * *, as said by the learned Superior Court in Sturdevant Unemployment Compensation Case, 158 Pa. Super. 548, 45 A.2d 898, 903, 'Real not imaginary, substantial not trifling, reasonable not whimsical, circumstances (which) compel the decision to leave employment' or to refuse suitable work. But in addition, 'good cause' must be so interpreted that the fundamental purpose of the legislation shall not be destroyed." Barclay White Co. v. Unemployment Compensation Board of Review, etc., 356 Pa. 43, 50 A.2d 336, at page 340; Haug v. Unemployment Compensation Board of Review, 162 Pa.Super. 1, 356 Pa. 43, 56 A.2d 396; Duquesne Brewing Co. v. Unemployment Compensation Board of Review, 359 Pa. 535, 59 A.2d 913, at page 916; Department of Industrial Relations v.

Mann, 35 Ala.App. 505, 50 So.2d 780, supra.

▮ The element of good faith is an essential ingredient of "good cause." Department of Labor & Industry v. Unemployment Compensation Board of Review, 159 Pa.Super. 567, 49 A.2d 260; Department of Labor & Industry v. Unemployment Compensation Board of Review, 164 Pa.Super. 421, 65 A.2d 436; Wolfson v. Unemployment Compensation Board of Review, 167 Pa.Super. 588, 76 A.2d 498; Flannick v. Unemployment Compensation Board of Review, 168 Pa.Super. 606, 82 A.2d 671.

▮ Claimant had a perfect right to quit because the pay was not as great as he thought it should be, or because conditions in right-of-way sawing were different from those in strip sawing, and while lack of good cause does not connote fault or wrong, the term must be considered in connection with the right to benefits where one voluntarily quits immediate and fairly remunerative employment. As far as the record discloses, all right-of-way sawyers at Camp 60 were receiving the same rate of pay. There was, therefore, no inequality in this particular class of work at this Camp.

Claimant contended that because of the remoteness of Camp 60, he took this employment after he arrived there, under some compulsion, due to the expense of getting out and inability while at the Camp to secure other employment. However, the record discloses that claimant and other em-

ployees of this Camp went home over weekends and his associate, Howell, secured other employment within a week and a half after quitting and in January made about $1,100, and that claimant at the time of the hearing was making about $45 per day, both working for the Potlatch Forests, Inc.

The record shows that while frequently the amount sawed in any one day would be less than that to which employees claimed they were entitled, over a week's period the cutting would average up above the minimum. There is no definite evidence in the record as to the specific conditions in the right-of-way area where claimant was cutting, beyond where he was cutting for the day and a half; and while a week's period is not a fixed criterion, this factual situation clearly has a bearing upon the reasonableness of claimant's asserted cause for quitting.

The Board's finding that—"On the job in question claimant was netting approximately $14.16 daily, excluding saw rental", was true only as to the twelve hours he worked. Employer's Ex. No. 4 shows for the week of December 31, 1951, when claimant again worked for the same Company herein, he received as wages for the first day, $12.28; for the second day, $12.28; for the third day, $27.59; fourth day, $29.82, and fifth day, $14.28, saw hire $41.34, total $137.79; taking the full five days to bring the average up to $27.55.

In view of all the circumstances, the short time claimant tried out the job was insufficient to establish an average daily wage. While he had a right to quit, the causes given were not sufficient to entitle him to employment security benefits. In re Anderson, 39 Wash.2d 356, 235 P.2d 303, at page 306; Department of Industrial Relations v. Scott, 36 Ala.App. 184, 53 So.2d 882; Claim of Greaser, 279 App.Div. 702, 108 N.Y.S.2d 239; Claim of Wetzig, 279 App.Div. 833, 109 N.Y.S.2d 207; 81 C.J.S., Social Security and Public Welfare, § 170, page 258.

The order of the Board is, therefore, reversed. Costs to appellant.

PORTER, C. J., and TAYLOR, THOMAS and KEETON, JJ., concur.